IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRAVIS MICJAN and STEPHANIE MICJAN, | ) | |
| Co-administrators of the Estate of DYLAN | ) | |
| MICJAN, a deceased minor and in their own right, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs | ) | Civil Action No. 14-855 |
| | ) | |
| WAL-MART STORES, INC., GARAN, INC., and | ) | |
| GARAN SERVICES CORP., | ) | |
| Defendants, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| TRIBORO QUILT MANUFACTURING CORP., | ) | |
| Third-Party Defendant. | ) | |

MEMORANDUM AND ORDER

Presently before the Court is a motion for summary judgment, originally filed by

Defendants, Garan, Inc., and its subsidiary, Garan Services Corp. (together, the Garan

Defendants), and later joined in via separate motions by Defendant Wal-Mart Stores, Inc. (Wal-

Mart) and Third-Party Defendant Triboro Quilt Manufacturing Corp. (Triboro).  For the reasons

that follow, the motions will be denied.

Plaintiffs, Travis Micjan and Stefanie Micjan,[1] co-administrators of the estate of Dylan

Micjan, a deceased minor and in their own right, bring this action alleging various state common

law and statutory tort claims against the Garan Defendants and Wal-Mart, arising out of the

tragic death of their 3-month old son, Dylan Micjan, on March 25, 2012.  Dylan died of

asphyxia, which Plaintiffs contend resulted from Dylan rolling face first into a defective and

dangerous crib bumper pad that was manufactured by Triboro, licensed by the Garan Defendants

---

[1] Although some of the documents submitted, including the notice of removal (and hence the
caption of the case) use the spelling "Stephanie," the Complaint and the Incident/Investigation
report in the record indicate that her name is spelled "Stefanie."  (ECF No. 85-1 at SPD 0006.)

and sold by Wal-Mart.  Defendants impleaded Triboro as a Third-Party Defendant to this action, although Wal-Mart subsequently dismissed its Third-Party Complaint.

In the pending motions, Defendants contend that Plaintiffs did not retain other items that were in Dylan's crib on the date of his death and thereby deprived them of the ability to defend themselves by presenting evidence that he did not asphyxiate on the crib bumper pad, but on some other item in his crib.  They contend that the failure to preserve these items constitutes spoliation and move for the most severe sanction, dismissal of the case with prejudice.

Facts

Travis Micjan admitted during his deposition that he had put Dylan in his crib at approximately 3:00 a.m. on the date of the accident. (T. Micjan Dep. 128:13-18.)[2]  He testified during his deposition that the items depicted in the photographs and marked as exhibits to the deposition labeled as "Micjan B" were "the crib bumper set that was in my son's crib." (T. Micjan Dep. 75:10-23 & Micjan B.)[3]  Mr. Micjan admitted that the items depicted were not the only items present in Dylan's crib when Mr. Micjan found him on the date of the accident. (T. Micjan Dep. 75:24-76:8.)

Stefanie Micjan, upon observing the deposition exhibits marked as "Micjan B", also admitted that the items depicted were not the only items present in Dylan's crib on the date of the accident. (S. Micjan Dep. 123:9-21.)[4]  Travis Micjan identified a stuffed animal and a form-fitting pillow as being additional items in Dylan's crib when he found him but that were not

---

[2] Pls.' App. (ECF No. 85-1) Ex. 11.  The Garan Defendants have made each excerpt from a deponent's deposition a separate exhibit in the Appendix to their motion for summary judgment (ECF No. 63).  Plaintiffs (whose Appendix picks up after Defendant's sequence at Exhibit 11) have submitted Travis Micjan's entire deposition.  Unless otherwise noted, all citations to this deposition will be to Plaintiff's Exhibit 11.
[3] Defs.' App. Ex. 2.
[4] Defs.' App. Ex. 3.

depicted in the deposition exhibits marked "Micjan B." (T. Micjan Dep. 76:3-8.) Upon reviewing

the photographs depicting Dylan's crib taken by the Suffolk Police Department on the date of the

accident and marked as "Micjan H," Travis Micjan identified the items included in the crib as a

green blanket, a stuffed animal, a pillow, and a quilted blanket. (T. Micjan Dep. 97:18-98:8 &

Micjan H.)[5]

In Plaintiffs' response to the Garan Defendants' request for production 26, they stated

they were no longer in possession of the crib because it had been given away, and they did not

remember to whom it was given. (Defs.' App. Ex. 5, No. 26.) During his deposition, Travis

Micjan testified that he and his wife had given away Dylan's crib. (T. Micjan Dep. 197:15-16.)

In response to request for production 28, Plaintiffs similarly stated they were no longer in

possession of the crib mattress because it had been given away, and they did not remember to

whom it was given. (Defs.' App. Ex. 5, No. 28.) During her deposition, Stefanie Micjan testified

that they had given both the crib and the crib mattress to Goodwill. (S. Micjan Dep. 124:15-

125:4.)[6] In response to request for production 29, Plaintiffs stated that their counsel was not in

possession of the items requested. (Defs.' App. Ex. 5, No. 29.)

During her deposition, Stefanie Micjan testified that they were in possession of the

requested pillow and pillow case, and that she knew the pillow was in their house. (S. Micjan

Dep. 148:4-22.)[7] On September 17, 2015, Plaintiffs served supplemental discovery responses

requested by the Garan Defendants. Plaintiffs stated in their supplemental response to request

for production 29 that, after diligent search of their home following the depositions, they were

unable to find the remaining requested articles that were present in the crib on the date of the

---

[5] Defs.' App. Ex. 4.
[6] Defs.' App. Ex. 7.
[7] Defs.' App. Ex. 8.

incident, and that they believed the items were lost, either during the move from Pennsylvania to Virginia or during the subsequent move from Pennsylvania back to Virginia. (Defs.' App. Ex. 9, No. 29.) Stefanie Micjan testified during her deposition that they did not have most of Dylan's items anymore, and that the items had apparently been lost during their two moves, including the blue and white crochet blanket requested. (S. Micjan Dep. 150:3-151:10.)[8] She further testified that the stuffed animal requested was no longer in existence, as she had thrown it away after their dog had chewed on it, as "[T]here was no use for it to hold on to it." (S. Micjan Dep. 151:11-152:9.)

Mr. Micjan, who found Dylan deceased in his crib, testified that Dylan was found "with his face down in between … the mattress and the … bumper bad" and further described the position of Dylan's head and body in the crib. (T. Micjan Dep. 145-47; Defs.' App. Ex. 4 at SPD 0177, 0179.) He indicated that none of the items in the crib were touched between the time he first found Dylan and when the pictures were taken. (T. Micjan Dep. 146-47.)

The following exchange then occurred:

Q. When you first saw him … were you able to visualize his fact at all?

A. No, I couldn't see his fact. I could just see him and his skin tone.

Q. Okay. And his face was towards the mattress?

A. It was towards the crib pad.

Q. Okay. So it wasn't – he wasn't laying face down?

A. No.

(T. Micjan Dep. 148:10-19.) Plaintiffs note that no testimony or other evidence in this case indicates that Dylan's face was found up against the stuffed animal, the green blanket, pillow,

---

[8] Defs.' App. Ex. 10.

quilted blanket, crib or crib mattress. There is also no evidence that Dylan was moved from the position where he died afterward and Plaintiffs note that the police never collected any of the bedding in Dylan's room as evidence, or for any other reason. (T. Micjan Dep. 197:17-20.)

Dr. Wendy Gunther was the medical examiner from the Office of Chief Medical Examiner, Commonwealth of Virginia, who performed an autopsy on Dylan on March 26, 2012. She concluded that the pathological diagnosis was:

> Sudden unexpected infant death likely due to accidental suffocation in bumper pad.
> a. History, report of scene, doll scene reenactment;
> b. Anterior livor mortis pattern, including blanching of the nostrils.
> c. A few thymic petechiae;
> d. Pertinent negative: no evidence of abuse or neglect; no alternative explanation for death found at autopsy or ancillary studies.

(Pls.' App. Ex. 12 at 1.)

Dr. Gunther's "case summary and content" at the end of the Autopsy Report states that:

> This three-month 11-day-old baby was found unresponsive in his crib with his face pressed into the bumper pad. Scene investigation, doll scene reenactment, and autopsy suggested the possibility of accidental suffocation. He had been placed face up, but was old enough to turn himself onto his side. No disease, injury or sign of inflicted injury was discovered other than this finding. Autopsy by itself cannot prove death by accidental suffocation, but this is the likeliest cause when all other studies (histology, microbiology, screen for inborn disorders, vitreous electrolytes, toxicology) show either negative results, or a normal postmortem pattern.

(Id. at 4.)

At her deposition, Dr. Gunther testified about her findings:

A. Anterior livor mortis is present as a dusky red discoloration across the left side of the face, including the nose and mouth, with a linear blanching of the cheek lateral to the left eye, over a portion of the left pinna, all of the right nostril, and part of the left nostril and philtrum.

…

Q. Okay. The issue with regard to the bumper pad, do you have any

understanding of how you came to that determination?

A. If you ask me whether I can trace my thought process, no, the answer is of course not. But when I was reading the description of the livor mortis … and I started to describe … the blanching. When you press into the face of a dead person whose face is purple from lying on that side with that side of the face down, you get a white mark.

This child had a white mark across his cheek, across his ear (pinna) and across all of his right nostril, part of the left nostril, and the philtrum. The philtrum is the little bow-shaped gutter in the upper lip.

This means that the child's nose was compressed by something after he was dead. It doesn't show me how that compression happened, but it's unusual for that compression to occur in a line. I was probably thinking that that was the mark of the bumper pad in the crib.

…

[T]here is no autopsy method of scientifically definitely diagnosing asphyxia or suffocation. All we've got to go on are the findings. And this finding in particular is likely to have occurred in the position that the child was in when he died and continued lying there.

Q. [T]he position of where the child was lying, where did you get that information from?

A. From his face.

Q. Okay. Do you know whether or not there was any investigation done by your medicolegal investigator, in doing a doll scene reenactment, that the child was also against the mattress in this case?

A. I have no recollection of that. I'm sure our medicolegal death investigator investigated because that's what he does, but I have no recollection….

Q. Can the face being pressed against the mattress also lead to a baby's suffocation?

A. [after objection] You'd have to show me some way in which the mattress can make a white line across his face. The surface of a mattress doesn't make a white line. It makes a large flat white spot. It's not going to make a line. If you're suggesting that the edge of the mattress could somehow have gotten across his ear, his cheek, and his nose, then you have to show me how it could do that in a crib with his head not touching the bars, because there is no white parallel blanch spots on his forehead. If you can figure out some way that it could do that, then I

6

will say provisionally yes, but I don't understand how it can—how the mattress can do that.

Q. The … fact that there was … a determination by the medicolegal investigator that … the baby was found pressed against the mattress and the bumper pad, that doesn't affect your opinion at all?

A. [after objection] Mattress don't make lines.  They make flat marks, unless you can show me some way that the edge of the mattress could make that line without making any other marks on the baby.

…

Q. Would the items that are located in the crib be significant to you before you would attempt to determine what it was that might have caused asphyxia in Dylan Micjan?

A. [after objection] Only if they were reported as near his nose, not his mouth.  He should be an obligate nose-breather at this age.  And if they have linear edges.  It is difficult to gauge from one photograph whether there are any linear edges.  I don't see any, but that doesn't mean there aren't any.

…

Q. Would you consider the photograph of the articles inside [Dylan's crib] to be an unsafe sleep condition for the child?

A. I see many indications of unsafe sleep in here.  The bumper pads are the biggest.  I'm also looking at the mattress that I cannot evaluate by looking at it.  If it was an appropriate mattress for the crib, then it's not unsafe.…  We don't know that.  I see a sheet on it.  It looks like a typical infant sheet.  If it's a typical infant sheet, then it's safe, but I don't know if there is anything between the sheet and the mattress.  I see some stuffed animals and so forth.  I would much rather those were not in the crib because they can represent unsafe sleep situation.  But they were found near his feet, then they're not relevant.  And it goes on like that.  I see many items which are consistent with unsafe sleep and none which I can prove.

Q. And … would one of the conditions of unsafe sleep be the orange/red pillow in the crib?

A. [after objection] Only if it was involved in occluding his nostrils.

(Gunter Dep. 21:10-16, 27:16-23, 28:2-18, 29:10-30:3, 30:9-31:15, 69:16-70:3, 90:4-91:10.)

Plaintiffs state that the Suffolk, Virginia Police Department also conducted a full

investigation, including a scene reenactment, and concluded that there was no evidence of foul play. Moreover, they contend that the report corroborates the testimony of all the witnesses who have testified in this case: that Dylan was found with his face up against the crib bumper pad, and not the crib, pillow, blankets or stuffed animal. (Pls.' App. Ex. 14.)

In their reply, Defendants argue that Mr. Micjan's testimony about the position in which he found Dylan does not resolve the matter. They note that he never mentioned crib bumper pads to the on-scene police officers or the neighbor who was there that day (Pls.' App. Ex. 14 at 198; Balzer Dep. 40-43;[9] Baines Dep. 69-72.[10]) They also note that the first responders identified areas of lividity and the presence of rigor mortis that led to the conclusion that Dylan had been on his back, which was not consistent with what Mr. Micjan had said about the position in which he found Dylan. (Darden Dep. 25-26 & Ex. XX.)[11] They point out that Plaintiffs refused to allow the medicolegal investigator into Dylan's room at all and that they failed to report that other items were in the crib. (Robinson Dep. 82-83.)[12] The investigator testified that, in his opinion, the doll scene reenactment was inaccurate because it did not contain the other items that were in the crib. (Robinson Dep. 85-86.)

Finally, Defendants have submitted the affidavit of Michael Prange, a licensed professional engineer and biomechanical engineer, who states that:

> It is my opinion within a reasonable degree of engineering certainty that the crib, mattress and other items contained in the crib which were discarded in this matter resulted in the destruction of relevant evidence in this matter in the following respects:
> a. I was asked to assess the risk of asphyxia and possible interactions between an infant and items in the sleep environment; more specifically with the subject crib bumper as well as the other items in subject sleeping environment.

---

[9] Defs.' Reply Br. App. (ECF No. 88) Ex. 16.
[10] Defs.' Reply Br. App. Ex. 17.
[11] Defs.' Reply Br. App. Ex. 18.
[12] Defs.' Reply Br. App. Ex. 19.

b. The Consumer Product Safety Commission (CPSC) as well as other researchers have identified various risk factors associated with asphyxia in a sleep environment. These include the presence of other objects in the crib (e.g. blankets, pillows, cushions, toys), use of atypical sleeping environments (e.g. crib with a water mattress, the substitution of a folded and wrapped blanket for a mattress), construction and condition of the crib, hardware and componentry of the crib, placement of the mattress, and entrapment.

c. The evidence gathered from an inspection of the subject crib, subject mattress, and the other items contained in the crib would have been used to determine what potential role and/or contribution they played in the subject incident. Measurements and documentation of the material and physical characteristics of the crib, mattress, and other items within the crib environment, including interaction of these items (e.g., fit of the mattress within the crib frame) cannot be fully quantified from the available photographic evidence. Additional characteristics of the items in the crib that cannot be determined with the photographic evidence, include softness and permeability, that would have been used to assess the risk of asphyxia in the subject sleep environment. For example, the testing and examination of the pillow observed in the photographs would provide information regarding the compressibility, firmness, and exact size of the item.

(Prange Aff. ¶ 5.)[13]

Procedural History

Plaintiff filed this action in the Court of Common Pleas of Allegheny County on May 30, 2014. The first nine claims were alleged on behalf of Dylan against Wal-Mart and then mirrored by claims ten through eighteen asserted against the Garan Defendants, as follows: strict liability for failure to warn (Counts I, X), strict liability for defective design (Counts II, XI), strict liability for a manufacturing defect (Counts III, XII), negligence (Counts IV, XIII), breach of express warranty (Counts V, XIV), breach of implied warranty (Counts VI, XV), fraud by concealment (Counts VII, XVI), negligent misrepresentation (Counts VIII, XVII), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3 (UTPCPL) (Counts IX, XVIII). Count XIX alleges that all Defendants violated the Virginia

---

[13] Defs.' Reply Br. App. Ex. 15.

Consumer Protection Act, VA Code Ann. §§ 59.1-196 to 59.1-207. The final two counts

asserted wrongful death claims in Plaintiffs' own right against Wal-Mart (Count XX) and the

Garan Defendants (Count XXI).

On June 30, 2014, Wal-Mart, with the consent of the Garan Defendants, removed the

action to this Court on the basis of diversity jurisdiction in that: Plaintiffs are Pennsylvania

citizens[14]; Garan, Inc. is a Virginia corporation with its principal place of business in New York,

New York; Garan Services Corp. is a Delaware corporation with its principal place of business in

New York, New York; Wal-Mart is a Delaware corporation with its principal place of business

in Bentonville, Arkansas; and the amount in controversy, although not specifically alleged, very

likely exceeds the sum of $75,000.00, exclusive of interest and costs, because it arises out of the

death of an infant. 28 U.S.C. § 1332. (Notice of Removal ¶¶ 3-5, 9-13, 15 & Exs. F, G.)

On July 21, 2014, the Garan Defendants filed a partial motion to dismiss (ECF No. 8).

Plaintiffs filed a brief in opposition on August 11, 2014 (ECF No. 16) and the Garan Defendants

filed a reply brief on August 21, 2014 (ECF No. 20).

On September 2, 2014, the Court issued a Memorandum Opinion and Order which

granted in part and denied in part the Garan Defendants' motion to dismiss (ECF No. 22.)

Specifically, the Court granted the motion with respect to Counts X, XI, XII and XVIII and

denied it with respect to Count XV on the ground that Virginia law applies to this case and thus

these Pennsylvania law causes of action (strict liability, which is not recognized under Virginia

law, and the UTPCPL, which is a Pennsylvania statutory claim) should be dismissed.[15]

---

[14] After Dylan's death, in July of 2013, Plaintiffs moved to Elco in Washington County,
Pennsylvania and opened an estate for Dylan on February 14, 2014 in Washington County.
(Compl. ¶ 1; T. Micjan Dep. 12-13; ECF No. 16 at 2 & Ex. B.) In July 2014, the family moved
back to the house in Suffolk, Virginia. (T. Micjan Dep. 14-16.)
[15] Count XV, which alleged a claim of breach of implied warranty, was not dismissed because

On September 11, 2014, Wal-Mart filed a motion for judgment on the pleadings, in which it requested that the Court apply the law of the case to it and dismiss the corresponding claims for strict liability for failure to warn (Count I), strict liability for defective design (Count II), strict liability for a manufacturing defect (Count III) and violation of the UTPCPL (Count IX) on the ground that they are not cognizable under Virginia law. Plaintiffs did not oppose the motion and on November 4, 2014, a Memorandum Opinion and Order was entered granting Wal-Mart's partial motion for judgment on the pleadings and dismissing Counts I, II, III and IX (ECF No. 31).

On September 17, 2014, the Garan Defendants filed a Third-Party Complaint against Triboro (ECF No. 26) and on September 23, 2014, Wal-Mart followed suit (ECF No. 28). However, on December 12, 2014, Wal-Mart stipulated to the dismissal of its claims against Triboro (ECF No. 41).

On September 25, 2015, the Garan Defendants filed a motion for summary judgment based on the doctrine of spoliation (ECF No. 63). On October 20, 2015, Wal-Mart filed its joinder to the motion (ECF No. 71) and on October 26, 2015, Triboro filed its joinder to the motion (ECF No. 79).[16] Plaintiffs filed their brief in opposition on November 27, 2015 (ECF No. 86) and on December 11, 2015, Defendants and the Third-Party Defendant filed a joint reply brief (ECF No. 88). On December 16, 2015, Plaintiffs filed a motion for leave to file a sur-reply brief (ECF No. 89). The motion was granted on December 17, 2015 (ECF No. 90), and they filed a sur-reply brief on December 18, 2015 (ECF No. 93).

---

Virginia recognizes the same claim under its codification of the U.C.C.

[16] Wal-Mart and Triboro actually filed "motions for joinder," which is not what they intended. That is, they are permitted to join in the Garan Defendants' motion but on the merits the summary judgment motion should be denied for the reasons explained in the text.

<u>Summary Judgment Standard of Review</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 266 (3d Cir. 2005); <u>Doe v. County of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

<u>Spoliation of Evidence</u>

Defendants argue that, because Plaintiffs' claims are based upon Dylan's death from asphyxiation and because they did not maintain the other items in the crib (which Dylan could have suffocated on), they cannot present a full defense and therefore the claims should be dismissed. Plaintiffs respond that none of the elements of spoliation have been met and that, in

any event, dismissal of an action is the most severe sanction that can be imposed and it is not warranted in this case.

"Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012). The court also stated that "a finding of bad faith is pivotal to a spoliation determination." Id. at 79. The party who seeks a spoliation sanction bears the burden of proving these factors. Universal Underwriters Ins. Co. v. Dedicated Logistics, Inc., 2014 WL 7335668, at *4 (W.D. Pa. Dec. 19, 2014) (Fischer, J.) (citations omitted).

If spoliation has occurred, another analysis is invoked:

> Since the early 17th century, courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated. Jamie S. Gorelick, Steven Marzen and Lawrence Solum, Destruction of Evidence, § 2.1 (1989). Such evidence permitted an inference, the "spoliation inference," that the destroyed evidence would have been unfavorable to the position of the offending party. As Judge Breyer put it in Nation-wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982), "the evidentiary rationale [for the spoliation inference] is nothing more than the common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than is a party in the same position who does not destroy the document." As Judge Breyer also noted, the spoliation inference is also seen as having "prophylactic and punitive effects." Id. The admissibility of spoliation evidence and the propriety of the spoliation inference is well established in most jurisdictions, including Pennsylvania. See e.g., Nation-wide Check Corp., 692 F.2d 214 (1st Cir. 1982); Mensch v. Bic Corp., 1992 WL 236965 (E.D. Pa. 1992) (citing Pennsylvania cases); Gorelick, et al., supra, § 2.24.

> The district court here invoked a sanction far more serious than the spoliation inference. It barred all evidence emanating from Dr. Bratspies's observations and thereby deprived Schmid of any opportunity to prove his case. While we do not doubt the inherent authority of a district court to impose such a drastic sanction in an appropriate case, we conclude that this was not such a case. We believe the key considerations in determining whether such a sanction is

13

appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78-79 (3d Cir. 1994).[17]

As an initial matter, Defendants have not adequately explained how this case raises a "spoliation" issue at all. In a product liability case, spoliation is usually described as a plaintiff's failure to keep the product at issue, thereby depriving the defendant of the right to demonstrate that its product did not malfunction or was not defective. See, e.g., Lee v. Boyle-Midway Household Products, Inc., 792 F. Supp. 1001 (W.D. Pa. 1992) (plaintiff alleged that defendant's accelerator was defective but sold the car); Roselli v. General Elec. Co., 599 A.2d 685 (Pa. Super. 1991) (plaintiff alleged that glass carafe on a coffee maker exploded, but threw away the shards); Silvestri v. General Motors Corp., 271 F.3d 583 (4th Cir. 2001) (motorist injured in auto accident took no steps to prevent car from being repaired and sold and deprived defendant of defense that airbag was not defective); Cole v. Keller Indus., Inc., 132 F.3d 1044 (4th Cir. 1998) (employee injured while using ladder sued manufacturer, who moved for summary judgment on the ground that plaintiff's expert destroyed ladder while dismantling it for testing, but court of appeals reversed because there was no evidence of bad faith); Schmid, 13 F.3d at 77-78 (plaintiff sued saw manufacturer after injury and defendant moved to strike plaintiff's expert's testimony, photographs and the saw after the expert disassembled it to determine why the guard had closed slowly). Plaintiffs have kept the crib bumper pad at issue in this case and Defendants have not

---

[17] The court noted in Schmid that there is some authority suggesting that spoliation of evidence and the sanctions appropriate for spoliation are matters of state law, and other authority suggests that the preclusion of evidence is governed by federal law as part of a court's inherent power to sanction parties. Id. at 78. There appears to be no resolution to this issue, as both Schmid and other cases have noted that the standards are not materially different. The Pennsylvania Supreme Court adopted the Schmid analysis of spoliation in Schroeder v. DOT, 710 A.2d 23 (Pa. 1998).

argued that they have been unable to examine it.

The spoliation doctrine has also been applied to situations involving the failure to retain emails or other documents in a party's possession that are relevant to a claim or defense. MOSAID Technologies, Inc. v. Samsung Elec. Co., 348 F. Supp. 2d 332 (D.N.J. 2004) (in commercial litigation, defendant failed to put a litigation hold on the routine destruction of email and the court held that a spoliation inference was justified); Culler v. Shinseki, 2011 WL 3795009 (M.D. Pa. Aug. 26, 2011) (defendant should have put a litigation hold on ESI when plaintiff filed his initial EEOC complaint that his demotion constituted age discrimination, but there was no evidence that it did so intentionally or that the plaintiff suffered prejudice, so no inference was required); Bozic v. City of Washington, Pa., 912 F. Supp. 2d 257 (W.D. Pa. 2012) (city solicitor's intentional destruction of tape of meeting at which plaintiff claimed she was discriminated against because he said he thought the actual threat of litigation had passed – despite his knowledge of her prior discrimination claim, his involvement in its litigation and resolution, his recognition immediately after dismissing her that she would file suit and other facts – constituted spoliation). This case bears no resemblance to that situation.

Performing its own research, the Court has identified a line of cases (not cited by the parties) that comes closer to addressing this kind of situation: those involving fires in which the source of the fire is unknown or uncertain and the plaintiffs preserve only the object that they believe to have been the source of the fire. The Pennsylvania Superior Court has stated that:

> the reasoning of Schmid applies not only to cases where the product is lost or destroyed, but also to cases where alternative potential causes of the accident are lost or destroyed. See Pia v. Perrotti, 718 A.2d 321 (Pa. Super. 1998), appeal denied, 558 Pa. 621, 737 A.2d 743 (1999). Such evidence is certainly "relevant" to a products liability defense, even if the case may center primarily on the narrower question of whether or not the product itself was defective. Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994).

Mount Olivet Tabernacle Church v. Edwin L. Wiegand Div., 781 A.2d 1263, 1270 (2001), aff'd

mem., 811 A.2d 565 (Pa. 2002). In Mount Olivet, a church brought an action against the

manufacturer of an immersion heater that, it contended, had malfunctioned and caused a fire.

The defendant sought dismissal or a spoliation inference because the church allowed the fire

scene to be destroyed, thereby depriving it of the ability to prove another source for the fire. The

trial court rejected this argument, holding that: 1) there was no negligence or bad faith on the part

of the plaintiff; 2) there were voluminous photographs and documents of the scene, reducing the

need for an on-scene inspection; and 3) the fire department conducted its own investigation and

determined that the heater was the source of the fire. The Superior Court observed that the

plaintiff preserved what it had been informed was important and that there was little prejudice to

the defendant because potential alternative causes of the fire were speculative:

> Prejudice is less severe where an independent third party expert (such as a fire
> marshal) has investigated the scene, because in such a situation the defendant
> need not rely solely on the plaintiff's own investigation to determine the presence
> or absence of alternative causes. Howell [v. Maytag], 168 F.R.D. [502,] 507 n. 3
> [(M.D. Pa. 1996)]. Prejudice is also less severe in a design defect case, because
> the defendant can test and examine multiple products of the same design.
> Schroeder, 710 A.2d at 27-28; Schmid, 13 F.3d at 80. Finally, our courts have
> recognized that a defendant in a fire scene case is rarely precluded from
> presenting a defense to the plaintiff's claim. This is true because the defendant
> can cross-examine the plaintiff's experts and call its own experts to render
> opinions based on the plaintiff's evidence. Pia, 718 A.2d at 325; Baliotis, 870 F.
> Supp. at 1291. In this respect, the defendant is protected by the fact that the
> plaintiff has the burden of proving both a defect and causation. Schroeder, 710
> A.2d at 27.

Id. at 1272.[18]

In this case, the coroner independently concluded that the cause of death was most likely

asphyxiation on the crib bumper pad and she did not base this conclusion on the report of Mr.

---

[18] Interestingly, Judge Del Sole filed a concurring opinion because he found the majority's
spoliation analysis unnecessary when the plaintiff preserved the product at issue. Id. at 1275
(Del Sole, J., concurring).

Micjan about the position in which he found Dylan. Rather, as noted above, she found a line on the baby's face which was consistent with being compressed against the crib bumper pad and not consistent with the other items in the crib. Thus, this case resembles Mount Olivet and Plaintiffs were not required to retain all of the objects in the crib.

In any event, Defendants have not met the standards necessary to demonstrate that spoliation occurred. The items were in Plaintiffs' control and it is plausible that they would be relevant to Defendants' defense in this case, namely, that Dylan asphyxiated on an object other than the crib bumper pad. But, as noted above, the third factor requires bad faith to show actual suppression and the evidence in this case is that most of the items were lost when Plaintiffs moved from Virginia to Pennsylvania and then from Pennsylvania back to Virginia, their dog destroyed one item and they gave the crib and crib mattress to Goodwill. There is no evidence that their actions were a deliberate attempt to impede a potential defense. (T. Micjan Dep. 12-16, 197; S. Micjan Dep. 124, 150-52; Defs.' App. Ex. 5.)

Moreover, Defendants have not explained how the "duty to preserve the evidence was reasonably foreseeable to" Plaintiffs, lay persons who would have had no reason to anticipate that the blanket, mattress and other items could be part of some future defense in a lawsuit they had not filed. The Court of Appeals has stated that "the question of reasonable foreseeability is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." Bull, 665 F.3d at 77-78 (citation omitted). In the cases cited above in which courts found a duty to preserve, lawyers were involved and/or they failed to have their clients put litigation holds on the destruction of evidence.

In addition, Defendants have not explained why their defense depends upon obtaining the

actual items that were in the crib. There is no suggestion, for example, that these items would contain physical evidence that Dylan had asphyxiated on them. The loss of the particular items in the crib does not cause prejudice because Defendants can obtain other examples of such items and present them as part of their defense.

Nothing prevents Defendants from questioning Mr. and Mrs. Micjan at trial about the other items that were in the crib. Similarly, Defendants are free to question the medical examiner as to whether Dylan might have asphyxiated on another item in the crib, the existence of which is substantiated by photographs of the scene. And they can proffer their own expert to testify as to these matters. However, they have not demonstrated that Plaintiffs' failure to preserve the other items in the crib constitutes spoliation. Therefore, the Court need not address the issue of potential sanctions.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRAVIS MICJAN and STEPHANIE MICJAN,  )
Co-administrators of the Estate of DYLAN  )
MICJAN, a deceased minor and in their own right,  )
              Plaintiffs,  )
  )
    vs  )      Civil Action No. 14-855
  )
WAL-MART STORES, INC., GARAN, INC., and  )
GARAN SERVICES CORP.,  )
              Defendants,  )
  )
    vs  )
  )
TRIBORO QUILT MANUFACTURING CORP.,  )
             Third-Party Defendant.  )

ORDER

AND NOW, this 25th day of February, 2016,

IT IS HEREBY ORDERED that the motion for summary judgment filed by Defendants

Garan Services Corp. and Garan, Inc. (ECF No. 63) is denied.

IT IS FURTHER ORDERED that the motion for summary judgment filed by Defendant

Wal-Mart Stores, Inc. (ECF No. 71) is denied.

IT IS FURTHER ORDERED that the motion for summary judgment filed by Third-Party

Defendant Triboro Quilt Manufacturing Corp. (ECF No. 79) is denied.

                        s/Robert C. Mitchell_____
                        ROBERT C. MITCHELL
                        United States Magistrate Judge