IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRAVIS MICJAN and STEPHANIE MICJAN,  )
Co-administrators of the Estate of DYLAN  )
MICJAN, a deceased minor and in their own right,  )
         Plaintiffs,  )
          )
   vs  )      Civil Action No. 14-855
          )
WAL-MART STORES, INC., GARAN, INC., and  )      Magistrate Judge Mitchell
GARAN SERVICES CORP.,  )
         Defendants,  )
          )
   vs  )
          )
TRIBORO QUILT MANUFACTURING CORP.,  )
        Third-Party Defendant.  )

## MEMORANDUM OPINION AND ORDER

Presently before the Court is a motion for summary judgment, originally filed by

Defendant Wal-Mart Stores, Inc. (Wal-Mart) and later joined in by Defendants, Garan, Inc., and

its subsidiary, Garan Services Corp. (together, Garan) (ECF No. 128) and Third-Party Defendant

Triboro Quilt Manufacturing Corp. (Triboro) (ECF No. 127).  For the reasons that follow, the

motion will be granted with respect to Counts V, VII, VIII, XVII and XIX, granted in part and

denied in part with respect to Counts VI and XV, and denied with respect to Counts IV, XIII,

XX, XXI, Plaintiffs' request for damages based on their deceased child's earning potential and

Plaintiffs' request for punitive damages.

Plaintiffs, Travis Micjan and Stefanie Micjan,[1] co-administrators of the estate of Dylan

Micjan, a deceased minor and in their own right, bring this action alleging various Virginia state

common law and statutory tort claims against Wal-Mart and Garan, arising out of the tragic

---

[1] Although some of the documents submitted, including the notice of removal (and hence the
caption of the case) use the spelling "Stephanie," the Complaint and her deposition indicate that
her name is spelled "Stefanie."  (ECF No. 126 Ex. A at 8.)

death of their 3-month old son, Dylan Micjan, on March 25, 2012. Dylan died of probable asphyxia, which Plaintiffs contend occurred when his face became wedged in a defective and dangerous crib bumper pad that was manufactured by Triboro, licensed by Garan and sold by Wal-Mart. Defendants impleaded Triboro as a Third-Party Defendant to this action, although Wal-Mart subsequently dismissed its Third-Party Complaint.

In the pending motion, Wal-Mart contends that Plaintiffs cannot maintain their remaining survival actions (for negligence, breach of express warranties, breach of implied warranties, fraud by concealment, negligent misrepresentation, and violations of the Virginia Consumer Protection Act) because Virginia law permits them to pursue only wrongful death claims; that they cannot recover on the wrongful death claim because of their own contributory negligence; that they cannot maintain any claims alleging fraud because Wal-Mart made no representations and they did not rely on any; that Wal-Mart made no express warranties; that Plaintiffs did not rely on any implied warranties; that the estimates of Dylan's earning potential are based on pure speculation; and that Plaintiffs point to no evidence to support a request for punitive damages. Plaintiffs respond that they have presented sufficient evidence to recover on their claims, that the estimates of Dylan's earning potential were calculated with reasonable certainty and that Wal-Mart's actions are sufficient to support a request for punitive damages.

Facts

Plaintiffs allege in their Complaint that Dylan "died of asphyxia after rolling [his] face into a crib bumper pad manufactured, distributed and sold by defendants." (Compl. ¶¶ 11, 43.)[2]

---

[2] Notice of Removal (ECF No. 1) Ex. D. Plaintiffs have responded to Wal-Mart's statements of fact in groups (e.g., "1. Paragraphs 1-4 of defendants' Concise Statement of Material Facts are admitted.") (ECF No. 131 ¶ 1.) As a result, Plaintiffs' Additional Material Facts begin with paragraph 24, even though there are 31 paragraphs in Wal-Mart's Concise Statement. This is confusing and contrary to the Local Rule, which requires the non-moving party's statement to

Plaintiffs indicate that Stefanie Micjan purchased the crib bumper pad at Wal-Mart's store located in Franklin, Virginia in November 2011. (Compl. ¶ 33; Pls.' Resp. Wal-Mart Interrog. No. 3;[3] S. Micjan Dep. 36:20-23, 37:1-2.[4]) The crib bumper pad was manufactured by Triboro, under the "Garanimals" trademark license given by Garan, and sold by Wal-Mart at a store located in Franklin, Virginia. Plaintiffs were residents of the Commonwealth of Virginia at the time of Dylan's death and he died in their home in Virginia. (Compl. ¶ 39.)

Plaintiffs state they did not purchase the crib bumper pad based on any advertisement from Wal-Mart or any other party. (Pls.' Resp. Wal-Mart Interrog. No. 4; S. Micjan Dep 40:21-41:8; T. Micjan Dep. 64:17-65:4.[5]) Plaintiffs state that Travis Micjan installed the crib bumper pad in Dylan's crib. (T. Micjan Dep. 68:2-4.) Wal-Mart states that any labels, warnings, brochures, manuals, and instructions would have been provided by Triboro, the manufacturer. (Bussell Dep. 132:3-133:7.)[6]

Dylan was three and a half months old at the time of his death on March 25, 2012 at his home in Suffolk, Virginia. (ECF No. 126 Ex. G.) Travis Micjan testified that he put Dylan to bed at around 3:00 a.m. to 4:00 a.m., and that prior to that time, he was lying with Dylan in the living room. (T. Micjan Dep. 128-29, 134-35.) He testified that he placed Dylan in the crib on his back, swaddled with an orange blanket under his armpits so his arms were outside the blanket, with an orange pillow mostly behind his back. (Id. at 129-32.)

Stefanie Micjan testified that she went into Dylan's room at approximately 5:00 a.m. after hearing him cry. (S. Micjan Dep. 76.) The baby monitor in Dylan's bedroom broke weeks

---

"respond[] to each numbered paragraph in the moving party's Concise Statement of Material Facts." LCvR 56(C)(1)
[3] Wal-Mart App. (ECF No. 126) Ex. C.
[4] ECF No. 126 Ex. A.
[5] ECF No. 126 Ex. B.
[6] ECF No. 126 Ex. M.

prior to March 25, 2012 and was never fixed or replaced. (S. Micjan Dep. 112; T. Micjan Dep. 138-39.) She testified that she proceeded to change Dylan's diaper, swaddle him in a blanket and place him back in the crib in a supine position in the way her husband had done earlier. (S. Micjan Dep. 76, 79, 82, 85, 88.)

Travis and Stefanie Micjan testified that they woke up at 12:30 p.m. and noon, respectively, on March 25, 2012. (T. Micjan Dep.142; S. Micjan Dep. 90-91.)[7] She testified that neither she nor her husband checked on Dylan from 5:00 a.m. until after 1:00 p.m. when Travis Micjan went into Dylan's room. (S. Micjan Dep. 137.) Travis Micjan testified that when he went into Dylan's room that he found Dylan unresponsive, lying on his side, with his face pressed up against the crib bumper pad. (T. Micjan Dep. 145, 159.)

The Suffolk County Police Department's Incident/Investigation Report indicates that Travis Micjan discovered Dylan not breathing when he went to check on him at 1:10 p.m. (ECF No. 126 Ex. D.) He testified that he picked up Dylan and carried him to the living room while at the same time attempting to resuscitate him and call 911. (T. Micjan Dep. 148-50.) The Suffolk Fire and Rescue Pre-Hospital Patient Care Report indicates that they were notified of this incident at 1:12 p.m. (ECF No. 126 Ex. N.) Dylan was pronounced dead at 1:26 p.m. (Id.)

Dylan's death was investigated by the Suffolk County Police Department and the autopsy was performed by Dr. Wendy Gunther, Assistant Chief Medical Examiner of the Virginia Department of Health. Following completion of the autopsy, Dr. Gunther reported that the cause of death was "probable asphyxia," with a pathological diagnosis of "sudden infant death, likely due to accidental suffocation in bumper pad." (ECF No. 126 Ex. E.) Dr. Gunther testified at her deposition that pathological diagnoses are noted on autopsy reports, but not on death certificates,

---

[7] Plaintiffs "deny" this statement to the extent that it misstates their testimony, but it is an accurate description of their testimony.

and that the autopsy report consists of a "mixture of observations, history, and opinions."

(Gunther Dep. 27.)[8]

Dr. Gunther testified that her pathological diagnosis of death, "likely due to suffocation

in bumper pad," was based upon notes from the scene investigation. However, Dr. Gunther

testified that she could not state within a reasonable degree of medical certainty that the bumper

pads caused Dylan's suffocation. Specifically, Dr. Gunther testified:

> I do not have the scientific evidential reason to state that the bumper pads made the linear mark [linear blanching on Dylan's face]. All I have is a scene investigation which states that there were bumper pads in the crib and a mattress and that the child's face was up against the bumper pads. The edge of something marked the face. I think it is more reasonable than not that the bumper pads at the edge were what marked the child's face, as the bumper pads have an edge, and I cannot see how the mattress edge could mark the child's face without the bars of the crib marking the child's head; however, I have no way of proving that this occurred. Reasonable degree of medical certainty is a phrase best kept for areas where research allows you to make that determination. I will not answer within that term.

(Gunther Dep. 65.)  She further testified that there was no evidence of abuse of neglect, no

alternative explanation for death found at autopsy or ancillary studies, and no drugs or alcohol

were found in the child's blood. (Gunther Dep. 106.)

Werner U. Spitz, M.D., Plaintiffs' forensic pathology expert, testified that "death by

asphyxia invariably associated with the utmost conscious pain and suffering. No different than

death by fire." (Spitz Dep. 264-65.)[9]  According to Dr. Spitz, it would have taken Dylan three to

five minutes to suffocate to death. (Id. at 260-61.)

In addition to the crib bumper pad, Dylan's crib, at the time of his death, contained the

following: a mattress covered with a fitted sheet, a crocheted blanket, a fleece blanket, a stuffed

toy animal, and a pillow. (ECF No. 126 Ex. H.) Dr. Gunther testified at her deposition that such

---

[8] ECF No. 126 Ex. F.
[9] Pls.' Resp. Wal-Mart Concise Statement (ECF No. 131) Ex. O.

items encompass "soft bedding" that can create an unsafe sleep situation. (Gunther Dep. 89-91.) She noted that "the biggest" concern for an unsafe sleep situation was the bumper pads. Of the other items, only the fitted sheet and fleece blanket were preserved as evidence. The crib and crib mattress were donated by Plaintiffs (S. Micjan Dep. 124); the stuffed toy animal was destroyed by Plaintiffs' family dog (S. Micjan Dep. 151); and the crocheted blanket and the pillow were lost during several family moves (S. Micjan Dep. 150-51; Pls.' Supp. Answers Garan Req. for Production of Documents.[10]) Dr. Gunter testified that: "I would much rather those were not in the crib because they can represent unsafe sleep situation. But they were found near his feet, then they're not relevant." (Gunther Dep. 90:22-25.)

A search performed by Suffolk County Police during their investigation revealed several empty liquor bottles and evidence of marijuana and drug paraphernalia in the Plaintiffs' home. (ECF No. 126 Ex. G at 2.) Stefanie Micjan testified that the marijuana and drug paraphernalia were hers and that she knew that it was illegal. (S. Micjan Dep. 31-32.) She testified that she smokes a pack of cigarettes a day and that while she did not smoke in the home when Dylan was alive, visitors were permitted to smoke in the home so long as they were not near Plaintiffs' children. (Id. at 35.) Travis Micjan also testified to smoking a pack of cigarettes a day but that he only smoked in parts of the home and not around his children. (T. Micjan Dep. 199-200, 215.) He testified that he and his wife had one or two beers the night before Dylan's death. (Id. at 238.)

In an email from Zoran Todorovic, baby hard-goods "buyer" for Wal-Mart, to Joel Kaplan of Triboro on September 10, 2011, with the subject line "Crib Bumper Update – Chicago City Council," Zoran stated:

> Joel,
> Thank you for the update and keeping close eyes on this. After all, it seems to me

---

[10] ECF No. 126 Ex. I.

that we are headed in the right directions by separating bumpers. Next states that will probably follow the ban the sales of bumpers are California and Maryland.

(Kitzes Rpt. at 21.)[11] Further, an email from Richard Williams of Triboro on June 24, 2011 raised concerns about future action by the Consumer Product Safety Commission (CPSC):

Bumpers – there is a concern that bumpers will be outlawed by the CPSC, so Zoran asked us to make an item/packaging proposal to separate the bumper from the 4pc set. This should be done as soon as possible, so it can be shown and a decision made quickly.

(Id. at 19.) In an email from Joel Kaplan to Zoran Todorovic of Wal-Mart on September 9, 2011, it was indicated that an "enhanced consumer communication label" was being considered (and which was eventually instituted after Dylan's death) which reads: "WARNING To reduce the risk of suffocation, keep top of bumper up and in position. DO NOT allow bumper to sag down or in toward the sleeping surface. DO NOT use bumper if sagging cannot be corrected." (Id. at 20.)

In a presentation given at a Wal-Mart Infant Bedding Supplier Summit on November 9, 2011, it was stated that "Bumper pads are banned for sale in Chicago effective 4/4/2012" and at the time there was a "proposed rule to ban bumper pads as Hazardous Substance in Maryland." (Id. at 22.) With this knowledge, Wal-Mart's course of action was "crib bedding sets should no longer include bumper pads effective March 4, 2012." (Id.) Plaintiffs contend that Wal-Mart failed to warn them of the risk of suffocation posed by bumper pads of which it was well aware by that time. Further, on Wal-Mart's own website between May and June 2009, they advertised the "BreathableBaby" Mesh Crib Bumper/Liner which "reduces the risks of suffocation . . . promotes air flow and helps maintain air access." (Id. at 24.) The website still advertises the product as such.

---

[11] ECF No. 131 Ex. P.

In several customer comments on Wal-Mart's website between June 2008 and June 2010, purchasers of the BreathableBaby crib liner remarked things like:

> "Better than traditional thick bumpers: I felt much better knowing that the baby could breath[e], since he inevitably slept with his face pressed to it." – June 20, 2008

> "Great alternative: My baby started rolling over. Got worried his limbs would get caught in between the rails of the crib. However, I didn't want a traditional bumper because of the potential for suffocation . . ." – August 26, 2008

> "Love this!: This bumper has been so wonderful. My 4 month old son moves a lot in his sleep and I didn't want to use the regular bumper [anymore] because he will put his face against the bumper." – June 1, 2009

> "Great product: My 6 month old kept getting his feet caught in the crib railing, but you read about how bumpers could be dangerous for babies. This is a great compromise because you know that your baby can breathe through this bumper and my lil boy won't get frustrated getting stuck." – September 15, 2009

> "Love it!: Bought it to feel safer about having a 'bumper' in our 7 month … old's crib. Love that it is breathable, no longer have to worry if our son puts his face up to it while he sleeps." – January 20, 2010

(Id. at 25-26.)[12]

Wal-Mart objects to these statements as hearsay, but the Court of Appeals recently reiterated that "hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." Fraternal Order of Police, Lodge 1 v. City of Camden, 2016 WL 6803036, at *3 n.14 (3d Cir. Nov. 17, 2016). In addition, Plaintiffs argue that the statements are not being offered for the truth of the matter asserted (that is, that traditional crib bumper pads are dangerous or that mesh liners are safer), but only that the statements were made, thereby putting Wal-Mart on notice of them. Fed.R.Evid. 803(3). See GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D., P.C., 769 F. Supp. 2d 630, 647 (S.D.N.Y. 2011). The Court concludes

---

[12] Wal-Mart objected to these customer comments as not being "part of the record") (ECF No. 135 ¶ 34). In response, Plaintiffs submitted the comments into the record as an attachment to their sur-reply brief (ECF No. 144 Ex. A).

that the statements from the website may be considered.

Further, Zoran Todorovic testified that he "heard" for the first time in "late 2010, early 2011 . . . that bumpers may not be safe for children." (Kitzes Rpt. at 29.) With that information, "[Wal-Mart] didn't do anything because product was still safe and it is still safe." (Id.) Plaintiffs note that Wal-Mart performed no testing of the product to support that conclusion. (Id. at 18.)

Among other things, Mr. Kitzes opined the following:

> For over 2 years before Stefanie Micjan purchased the subject Wal-Mart/Triboro bumper pads, Wal-Mart clearly understood that mesh crib liners had the capacity to substantially reduce or eliminate the danger of infant suffocation in their cribs as opposed to the traditional polyester fiber bumper pads.

> Accepting that Wal-Mart's website statements are true and accurate (and not misrepresentations as defined by the Federal Trade Commission Act), Wal-Mart admits that they were aware of the heightened dangers of suffocation associated with the traditional Garanimals bumper pads. The pads sold to [Plaintiffs] sometime in November of 2011 were sold without any warning of the suffocation danger identified by Wal-Mart years before the sale.

> . . .

> Since eliminating the hazard by substituting a breathable mesh material was shown by Wal-Mart to be feasible years before the death of Dylan Micjan, parents must, at a minimum, be informed of the danger so that they can make an informed judgment about the safety of their child . . . Since the alternative mesh sided pad is readily available, the use of a warning would not fully reduce the danger of suffocation.

> . . .

> Believing that bumper pads would soon be outlawed, in mid-2011 Wal-Mart and Triboro began the process of eliminating bumper pads from their 4-piece crib bedding sets. Bumper pads were offered as a [stand-alone] product[.]

> In 2011, the American Academy of Pediatrics (AAP) recommended against the use of bumper pads, and in September 2011, the City of Chicago banned their sale due to concern about suffocation risks.

> . . .

> Despite mounting evidence of the risk of suffocation associated with the

Wal-Mart Garanimals bumper pads, Wal-Mart continued to sell polyester fiber pads and abdicated their responsibility to protect very young infants from the catastrophic risks of injury and death.

. . .

In spite of nearly a decade of discussion about the risk of suffocation from polyester fiber crib bumper pads, Walmart continues to sell essentially the same product they sold when the issue was first raised. Though there are many opinions about how many children have died, there is no question that the risk of suffocation is higher with traditional bumper pads than with the mesh crib liners that Walmart has sold since at least 2009. There was no labeling concerning the risk of suffocation prior to Dylan's death.

. . .

Walmart and Triboro had more than enough information about infant suffocation with traditional polyester fiber bumper pads to take corrective action to protect infant children well before the death of Dylan Micjan. They were already selling a mesh crib liner that would substantially reduce or eliminate the risk, and more likely than not, could have prevented Dylan's death.

. . .

By maintaining their silence, Wal-Mart deprived consumers of the information they needed to make an informed decision about the safety of their infant children, resulting in an unreasonable risk of suffocation and death.

(Id. at 33-40.)

Plaintiffs note that Wal-Mart continued to sell traditional polyester fiber filled bumper pads despite their clear understanding that mesh crib liners would substantially reduce or eliminate infant suffocation – according to their own website – without adequately informing consumers of the comparative risks. (Kitzes Rpt. at 10.) They argue that, after deciding to continue sales of the subject crib bumper pad with a higher risk of suffocation, Wal-Mart failed to follow its own Policy Directive which stated that "consumers must be informed of all reasonably foreseeable events that may lead to . . . personal injury . . . of if there is a reasonably foreseeable risk that may occur during product use . . ." (Id. at 11.)

Bradley Thach, M.D., a neonatologist and another one of Plaintiffs' experts, co-authored an article titled "Deaths and Injuries Attributed to Infant Crib Bumper Pads" in the Journal of Pediatrics in 2007, which attributed 27 deaths to bumper pads over a 20 year period.  (Id. at 12.) Plaintiffs previously submitted Dr. Thach's expert report, in which he opined that: 1) "all traditional crib bumpers are inherently dangerous, as they pose a risk for fatal rebreathing when an infant's face is pressed into the bumper or his head is wedged between the bumper and another soft surface"; 2) Dylan died from suffocation when his face was compressed against the crib bumper, as evidenced by a death scene reconstruction using a mannequin and the fact that the right side of his face was noticeably pale which would indicate facial compression against a soft surface, and the blanket, pillow and stuffed animal were not against his face; and 3) Wal-Mart advertised a mesh bumper as reducing the risk of suffocation, thereby demonstrating awareness of the suffocation hazard posed by traditional crib bumpers.  (ECF No. 107 Ex. 10 at 4-5.)

Rachel Y. Moon, M.D. with the Children's National Medical Center also published an article in the Journal of Pediatrics in 2007, which was entitled "'And Things that Go Bump in the Night': Nothing to Fear?" which indicated that CPSC data shows that infants suffer no long-term injuries form contact with crib slats, and that the Canadian Paediatric Society and Health Canada issued recommendations against bumper pads.  (Kitzes Rpt. at 13.)

Suad Wanna-Nakamura authored a "White Paper" for the CPSC in July 2010 which also focused on the deaths attributable to crib bumper pads. (Id. at 16.)  Wal-Mart admits that it had no requirement for itself or its third-party testing labs that crib bumper pads be tested for breathability. (Id. at 18.)

On April 20, 2011, an email to Beth Schommer, Wal-Mart US's VP for Product Safety &

Compliance, stated "the consumer reporter at USA Today asked if Walmart does anything to alert parents to safety issues associated with crib bumpers or require that suppliers make safer ones. (Id.)

Procedural History

Plaintiff filed this action in the Court of Common Pleas of Allegheny County on May 30, 2014.[13] The first nine claims were alleged on behalf of Dylan against Wal-Mart and then mirrored by claims ten through eighteen asserted against Garan, as follows: strict liability for failure to warn (Counts I, X), strict liability for defective design (Counts II, XI), strict liability for a manufacturing defect (Counts III, XII), negligence (Counts IV, XIII), breach of express warranty (Counts V, XIV), breach of implied warranty (Counts VI, XV), fraud by concealment (Counts VII, XVI), negligent misrepresentation (Counts VIII, XVII), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3 (UTPCPL) (Counts IX, XVIII). Count XIX alleged that all Defendants violated the Virginia Consumer Protection Act, VA Code Ann. §§ 59.1-196 to 59.1-207 (VCPA). The final two counts asserted wrongful death claims in Plaintiffs' own right against Wal-Mart (Count XX) and against Garan (Count XXI).

On June 30, 2014, Wal-Mart, with the consent of Garan, removed the action to this Court on the basis of diversity jurisdiction in that: Plaintiffs are Pennsylvania citizens[14]; Garan, Inc. is a Virginia corporation with its principal place of business in New York, New York; Garan Services Corp. is a Delaware corporation with its principal place of business in New York, New

---

[13] Notice of Removal (ECF No. 1) Ex. D.
[14] After Dylan's death, in July of 2013, Plaintiffs moved to Elco in Washington County, Pennsylvania and opened an estate for Dylan on February 14, 2014 in Washington County. (Compl. ¶ 1; T. Micjan Dep. 12-13; ECF No. 16 at 2 & Ex. B.) In July 2014, the family moved back to the house in Suffolk, Virginia, where they apparently still reside. (T. Micjan Dep. 14-16.)

York; Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas; and the amount in controversy, although not specifically alleged, very likely exceeds the sum of $75,000.00, exclusive of interest and costs, because it arises out of the death of an infant. 28 U.S.C. § 1332. (Notice of Removal ¶¶ 3-5, 9-13, 15 & Exs. F, G.)

On July 21, 2014, Garan filed a partial motion to dismiss (ECF No. 8). On September 2, 2014, the Court issued a Memorandum Opinion and Order which granted in part and denied in part the motion to dismiss (ECF No. 22.) Specifically, the Court granted the motion with respect to Counts X, XI, XII and XVIII and denied it with respect to Count XV on the ground that Virginia law applies to this case and thus the Pennsylvania law causes of action (strict liability, which is not recognized under Virginia law, and the UTPCPL, which is a Pennsylvania statutory claim) should be dismissed.[15]

On September 11, 2014, Wal-Mart filed a motion for judgment on the pleadings, in which it requested that the Court apply the law of the case to it and dismiss the corresponding claims for strict liability for failure to warn (Count I), strict liability for defective design (Count II), strict liability for a manufacturing defect (Count III) and violation of the UTPCPL (Count IX) on the ground that they are not cognizable under Virginia law. Plaintiffs did not oppose the motion and on November 4, 2014, a Memorandum Opinion and Order was entered granting Wal-Mart's partial motion for judgment on the pleadings and dismissing Counts I, II, III and IX (ECF No. 31).

On September 17, 2014, Garan filed a Third-Party Complaint against Triboro (ECF No. 26) and on September 23, 2014, Wal-Mart followed suit (ECF No. 28). However, on December 12, 2014, Wal-Mart stipulated to the dismissal of its claims against Triboro (ECF No. 41).

---

[15] Count XV, which alleged a claim of breach of implied warranty, was not dismissed because Virginia recognizes the same claim under its codification of the U.C.C.

On September 25, 2015, Garan filed a motion for summary judgment based on the doctrine of spoliation (ECF No. 63). On October 20, 2015, Wal-Mart filed its joinder to the motion (ECF No. 71) and on October 26, 2015, Triboro filed its joinder to the motion (ECF No. 79). On February 25, 2016, a Memorandum Opinion and Order was filed denying the request for summary judgment on this ground (ECF No. 99).

On March 22, 2016, Garan filed a motion for summary judgment (ECF No. 102) with respect to all of the claims still pending against it: Count XIII (negligence), Count XIV (breach of express warranties), Count XV (breach of implied warranties), Count XVI (fraud by concealment), Count XVII (negligent misrepresentation), Count XIX (VCPA) and Count XXI (wrongful death). On August 4, 2016, a Memorandum Opinion and Order was entered (ECF No. 122) granting the motion with respect to Counts XIV, XVI and XIX and denying it with respect to Counts XIII, XV, XVII and XXI and Plaintiffs' request for punitive damages. The remaining claims against Garan are: Count XIII (negligence), Count XV (breach of implied warranties), Count XVII (negligent misrepresentation) and Count XXI (wrongful death).

The remaining claims against Wal-Mart are as follows: Count IV (negligence), Count V (breach of express warranties), Count VI (breach of implied warranties), Count VII (fraud by concealment), Count VIII (negligent misrepresentation), Count XIX (VCPA) and Count XX (wrongful death). On September 15, 2016, Wal-Mart filed the pending motion for summary judgment (ECF No. 123) and Garan (ECF No. 128) and Triboro (ECF No. 127) indicated their joinder in it. On October 15, 2016, Plaintiffs filed their brief in opposition (ECF No. 130) and on October 31, 2016, Wal-Mart filed a reply brief (ECF No. 134). On November 17, 2016, Plaintiffs filed a sur-reply brief (ECF No. 144).

<u>Summary Judgment Standard of Review</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Wal-Mart argues that: 1) under Virginia law, Plaintiffs can recover only under a theory of wrongful death, not survival actions, and thus Counts IV, V, VI, VII, VIII and XIX should be dismissed; 2) Virginia is a contributory negligence state and therefore any negligence on the part of Plaintiffs is sufficient to defeat their claims, and here they failed to check on Dylan for over 8 hours, used an old crib that was banned and left one side down, left soft bedding items in the crib, and maintained a house full of liquor bottles, drug paraphernalia and cigarettes, any of which could have contributed to Dylan's death; 3) Plaintiffs point to no evidence that Wal-Mart

concealed any facts and they admit that they did not rely on any advertisement or statement by Wal-Mart when buying the crib bumper pad so the fraudulent concealment claim in Count VII must be dismissed; 4) the same analysis applies to the VCPA claim in Count XIX; 5) their lack of reliance means that the negligent misrepresentation claim in Count VIII must be dismissed; 6) Wal-Mart made no express warranties so Count V fails; 7) Plaintiffs did not rely on any representations and in addition a regular sale does not import a warranty of quality or fitness for a particular purpose, so Count VI fails; 8) Plaintiffs' expert's estimates of Dylan's earning potential are pure speculation, not based on "reasonable certainty"; and 9) Plaintiffs' request for punitive damages should be dismissed because there is no evidence of willful, wanton or malicious conduct.

Plaintiffs respond that: 1) although Virginia law limits them to a wrongful death claim, they can still recover for Dylan's pain and suffering and loss of earning capacity; 2) Wal-Mart's examples of their alleged contributory negligence have no connection to Dylan's death; 3) unlike Garan, Wal-Mart knew of the dangers of crib bumper pads but ignored them, failed to test for them and did not reveal them to its customers; 4) the same analysis applies to the VCPA claim; 5) the same analysis applies to claims for negligent misrepresentation and constructive fraud; 6) Wal-Mart's act of selling a product represented it as safe and Plaintiffs could not have bought the crib bumper pad if Wal-Mart had not put it on the shelf; 7) they concede to the dismissal of the claim of breach of the implied warranty of fitness for a particular purpose, but not the claim of breach of the implied warranty of merchantability, which Wal-Mart has not challenged; 8) Dylan's lost future income and earning capacity is not based solely on statistics but on relevant factors and the other factors Wal-Mart mentions would not aid the analysis; and 9) the case for punitive damages against Wal-Mart is even stronger than the case against Garan—Wal-Mart

knew about mesh liners, ignored its stated policy of informing consumers of risks, never tested the product for breathability and was aware of studies showing the danger of asphyxiation.

In a reply brief, Wal-Mart argues that: 1) Plaintiffs concede that they cannot proceed with survival actions but then attempt to cure the defects in these claims, but it is too late and the cases they cite are distinguishable; 2) there can be more than one proximate cause and the facts cited are more than sufficient to show Plaintiffs' contributory acts; 3) Plaintiffs rely on customer comments which are hearsay and not part of the record and on a comment by Stefanie Micjan which is taken out of context and provides no basis for concluding that she relied on any representation made by Wal-Mart; 4) Plaintiffs support their breach of express warranty claim with mere boilerplate legal conclusions; 5) in a wrongful death action, a plaintiff can recover only that portion of earnings that the beneficiaries reasonably expected to receive and Plaintiffs' expert conceded that he did not calculate whether Dylan would have provided any economic support to his parents; and 6) the "facts" Plaintiffs rely on in support of their request for punitive damages are journal articles, but they ignore the CPSC study finding no conclusive evidence of the dangers of crib bumper pads.

Plaintiffs requested leave to file a sur-reply brief, which was granted, and in it they argue that the customer reviews taken from Wal-Mart's website and cited in the expert report of William Kitzes are not hearsay. Therefore, they argue that these reviews can be cited to show that Wal-Mart was on notice of the dangers of "traditional" crib bumper pads and that Wal-Mart concealed this information from them and other customers.

<u>Survival Actions and Wrongful Death Actions</u>

Under Virginia law,[16] survival actions are governed by Va. Code Ann. § 8.01-25, which

---

[16] This Court has determined that Virginia law applies in this case. (ECF No. 22 at 10.)

provides as follows:

> Every cause of action whether legal or equitable, which is cognizable in the Commonwealth of Virginia, shall survive either the death of the person against whom the cause of action is or may be asserted, or the death of the person in whose favor the cause of action existed, or the death of both such persons. Provided that in such an action punitive damages shall not be awarded after the death of the party liable for the injury. Provided, further, that if the cause of action asserted by the decedent in his lifetime was for a personal injury and such decedent dies as a result of the injury complained of with a timely action for damages arising from such injury pending, the action shall be amended in accordance with the provisions of §8.01-56 [wrongful death statute]. As used in this section, the term "death" shall include the death of an individual or the termination or dissolution of any other entity.

Va. Code Ann. § 8.01-25.

Under Virginia law, an action for death by wrongful act is governed by Va. Code Ann.

§ 8.01-50, which provides as follows:

> A. Whenever the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation, or of any ship or vessel, and the acts, neglect, or default is such as would, if death had not ensured, have entitled the party injured to maintain an action, or to proceed in rem against such ship or vessel or in personam against the owners thereof or those have control of her, and to recover damages in respect thereof, then, and in every such case, the person who, or corporation or ship or vessel which, would have been liable, if death had not ensured, shall be liable to an action for damages, or, if a ship or vessel, to a libel in rem, and her owners or those responsible for her acts or defaults or negligence to a libel in personam, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances, as amount in law to a felony.

Va. Code Ann. § 8.01-50.

As set forth in Va. Code Ann. § 8.01-25, if a plaintiff, while alive, files a cause of action

for personal injury and dies while the action is pending as a result of the same injury, then the

cause of action is to be amended in accordance with Va. Code Ann. § 8.01-56. Wal-Mart

contends that, while it was factually impossible for an action be filed on Dylan's behalf during

his lifetime, Va. Code Ann § 8.01-56 remains instructive.

Va. Code Ann § 8.01-56 provides, in pertinent part, as follows:

> …when a person who has brought an action for personal injury dies pending the action, such action may be revived in the name of his personal representative. If death resulted from the injury for which the action was originally brought, a motion for judgment and other pleadings shall be amended so as to conform to an action under § 8.01-50, and the case proceeded with as if the action had been brought under such section. In such cases, however, there shall be but one recovery for the same injury.

Va. Code Ann. § 8.01-56. Wal-Mart cites Hendrix v. Daugherty, 457 S.E.2d 71 (Va. 1995), in which the Supreme Court of Virginia stated that "[t]he plain language contained in Code §§ 8.01-25 and -56 unequivocally mandates that a person may not recover for the same injury under the survival statute and the wrongful death statute." Hendrix, 457 S.E.2d at 75. It therefore argues that only the wrongful death statute is applicable in this matter.

Wal-Mart cites El-Meswari v. Washington Gas Light Co., 785 F.2d 483 (4th Cir. 1986), in which wrongful death and negligent infliction of emotional distress actions were brought by the personal representative of a five-year-old boy who was killed by roofing materials thrown from the roof of an apartment building. El-Meswari, 785 F.2d at 483. The court in El-Meswari held that, if a lawsuit had been filed on the minor's behalf when the minor was alive and the minor had subsequently died, it would have necessarily been amended to a wrongful death action pursuant to § 8.01-25, and therefore the lawsuit filed after the minor's death was properly construed as a wrongful death action only. The court stated as follows:

> The last sentence quoted from § 8.01-25 would require [decedent's] representative, if [decedent] had filed suit prior to her death for the injuries, to amend the pending claim to a wrongful death action; consonant with traditional wrongful death purposes, the representative would then be unable to recover for [decedent's] pain and suffering.
>
> We see no reason why the Virginia Supreme Court would adopt a different approach to the case in which [decedent's] personal injury suit had not been filed at the time of her death. To the contrary, the court hoped in Seymour v. Richardson to avoid "the illogic of allowing damages for those elements in an

action brought by the injured person and revived in the name of his personal representative, but not in action for the same cause if brought originally by his personal representative." 75 S.E.2d at 81. Presumably the court would want equally to avoid the converse illogic of allowing damages in an original representative suit but not in a revival action.

Id. at 491. See also Lucas v. HCMF Corp., 384 S.E.2d 92, 94 (Va. 1989) ("Code § 8.01-25 entitles a decedent's personal representative to file a motion for judgment seeking damages for personal injuries sustained by the decedent; however, if the injuries cause death, the recovery must be sought under Code § 8.01-50, the wrongful death statute.")

However, Wal-Mart has omitted several important facts from this analysis: 1) the Hendrix court did not hold that a court should dismiss either a survival action or a wrongful death action when a plaintiff brings both, but only that eventually the plaintiff must make an election of which kind of action is being pursued; 2) Hendrix is not the last word on this topic from the Virginia Supreme Court; and 3) even the Virginia statutes themselves distinguish between claims that "are related to the death" of a decedent and those that are not.

First, as noted, the Hendrix court held only that a plaintiff must make an election at some point whether to proceed with a survival action or a wrongful death action. No case cited by Wal-Mart authorized a court to dismiss one of the claims, the argument it presents here. Moreover, that election need not be made prior to trial. As the Virginia Supreme Court subsequently stated:

> Since deciding Hendrix, we have not been afforded the opportunity to address further the circumstances that would constitute the "appropriate time after discovery has been completed" at which a circuit court must require an election between a survival personal injury claim and a wrongful death claim. Nor have we specifically addressed whether there can be circumstances in which that "appropriate time" might be after the trier of fact has resolved disputed issues of liability.

Centra Health, Inc. v. Mullins, 670 S.E.2d 708, 717 (Va. 2009). In that case Leonard Mullins

died from a urinary tract infection that he developed after hospital staff negligently failed to

remove a catheter that had been inserted when he was admitted for surgery to treat a broken hip.

The administrators of his estate brought both a wrongful death action for his death resulting from

sepsis and an alternative survival claim for the personal injuries he received prior to his death as

a result of the negligent handling of the catheter.  The court noted that, in a typical case, the

plaintiff seeks to preserve the option to pursue either a survival action or a wrongful death action

because the defendant contests the issue of causation:

> Centra Health vigorously contested that Mullins had suffered any compensable
> injury for which a survival claim could be successfully maintained and also that
> any act of Centra Health's employees had caused Mullins' death. Contrary to
> Centra Health's contention, we did not hold in <u>Hendrix</u> that a plaintiff would
> always be required to elect between remedies prior to trial. Rather, the election is
> required only at a time when the record sufficiently establishes that the personal
> injuries and the death arose from the same cause. In this particular case, the circuit
> court correctly determined that compelling an election would put the
> administrators in the untenable, and manifestly unjust, position of having to elect
> between two potentially viable claims, which Centra Health was contesting on
> separate and independent grounds. Under those circumstances, there was no
> "appropriate time" prior to trial at which compelling an election would not have
> prejudiced the administrators and, consequently, unfairly benefited Centra Health.
> Accordingly, we hold that the circuit court did not err in denying Centra Health's
> motion to compel the administrators to elect between the survival and wrongful
> death claims.

<u>Id.</u> at 718.

Thus, Virginia law, as the <u>Hendrix</u> case and the <u>Mullins</u> case have delineated, does not

require Plaintiffs to elect either a survival action or a wrongful death action relating to Dylan's

death prior to trial, much less does it require this Court to make the election for Plaintiffs and

dismiss the survival actions.[17]  This argument is rejected.

---

[17] Although Plaintiffs do not oppose Wal-Mart's argument about being able to maintain both
causes of action, Wal-Mart is not entitled to summary judgment on this ground unless it is
"appropriate." <u>Anchorage Assocs. v. V.I. Bd. of Tax Review</u>, 922 F.2d 168, 175 (3d Cir. 1990).
In any event, Plaintiffs have not formally elected to pursue only their wrongful death claim.

Moreover, Wal-Mart's argument conflates the negligence action alleged in Count IV of the Complaint with all of the other claims Plaintiffs assert against Wal-Mart on Dylan's behalf, namely breach of express warranties (Count V), breach of implied warranties (Count VI), fraud by concealment (Count VII), negligent misrepresentation (Count VIII), and the VCPA claim (Count XIX). None of these claims are "related to" Dylan's death merely because Wal-Mart allegedly committed these torts and he died thereafter. Therefore, even if the doctrine that Wal-Mart advocates applied, it would not have no bearing on these other claims. Wal-Mart's motion to dismiss Counts IV, V, VI, VII, VIII and XIX on the ground that Plaintiffs may only pursue the wrongful death claim in Count XX is denied.[18]

Count V: Breach of Express Warranties

In Count V, Plaintiffs allege a claim of breach of express warranties. Wal-Mart moves to dismiss this claim on the ground that it made no express warranties. Plaintiffs respond that Wal-Mart placed the crib bumper pad on its shelves and thereby represented it as safe.

Section 8.2-313 of the Virginia Code governs express warranties. Under § 8.2-313, a seller may create an express warranty through: "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods ....; (b) [a]ny description ....; [or] (c) [a]ny sample or model" that is made part of the basis of the bargain between the seller and the buyer. Va. Code § 8.2-313. The existence of an express warranty does not depend on whether the seller used the words "warrant" or "guarantee," or whether the seller specifically intended to make an express warranty. Id. § 8.2–313(2). A seller's mere affirmation of the goods' value, opinion or commendation of the goods does not create a warranty. Id. "Express warranties are not presumed and will not be inferred from ambiguous, inconclusive, or general discussions. The language employed must indicate a clear intention to enter into a contract of warranty when it is viewed in light of all the facts and circumstances surrounding the transaction." Whitehorse Marine, Inc. v. Great Lakes Dredge & Dock Co., 751 F. Supp. 106, 108 (E.D. Va.1990) (citing Jacobs v. Warthen, 115 Va. 571, 576, 584, 80 S.E. 113 (1913); Reese v. Bates, 94 Va. 321, 330, 26 S.E. 865 (1897) (additional citations omitted)). The Virginia Supreme Court recognizes that an express warranty claim

_____

[18] By the same reasoning, the motion for summary judgment by Garan as to the remaining survival actions against it (Counts XIII, XV and XVII) is denied.

that "merely parrot[s] the language of § 8.2-313, which sets forth several legal
bases for the creation of express warranties, and amount[s] to no more than a legal
conclusion" is insufficient where the claimant fails "to produce any contract or
agreement or any express warranty forming the basis of the express warranty
claim." Hubbard v. Dresser, 271 Va. 117, 123, 624 S.E.2d 1, 4 (2006) (citing
Pulte Home Corp. v. Parex, Inc., 265 Va. 518, 523, 579 S.E.2d 188, 190 (2003)).

Sutherlin v. Lowe's Home Centers, LLC, 2014 WL 4748530, at *2 (E.D. Va. Sept. 23, 2014).

Plaintiffs point to no authority that would hold a retail store liable for breach of express

warranties merely for placing on item for sale on its shelves and thereby representing it as safe

for use.  Moreover, they have not explained how such actions could constitute an "express"

warranty.  Therefore, Wal-Mart cannot be held liable for breach of express warranties and, with

respect to Count V, the motion for summary judgment will be granted.

Count VI: Breach of Implied Warranties

In Count VI, Plaintiffs allege a claim of breach of implied warranties.  Wal-Mart moves

to dismiss this claim on the grounds that Plaintiffs admitted that they did not rely on any

warranties and that the regular sale of a product does not import a warranty of fitness for a

particular purpose.  Plaintiffs respond that, although they concede that they cannot maintain a

claim for breach of the implied warranty of fitness for a particular purpose, they can maintain a

claim for breach of the implied warranty of merchantability.

Under Virginia law:

They are of two kinds: an implied warranty of merchantability or fitness for the
general purpose for which the goods are sold, and an implied warranty of fitness
for a particular purpose. The term merchantability applies when goods are
purchased for resale and means simply that they are of a quality or character
which will qualify them to be bought and sold in the ordinary course of business,
and is for our purposes interchangeable with the term fitness for the general
purpose for which the goods are sol[d]—which latter term is ordinarily used in
discussing a sale to a consumer.

Carney v. Sears, Roebuck & Co., 309 F.2d 300, 303 (4th Cir. 1962).  Wal-Mart has not argued

that it cannot be held liable on a claim of breach of the implied warranty of merchantability. As a seller of an allegedly defective product, there would be no basis to exclude Wal-Mart from potential liability on this claim. See Bilenky v. Ryobi Technologies, Inc., 115 F. Supp. 3d 661, 670 (E.D. Va. 2015).

Therefore, the motion for summary judgment as to Count VI will be granted with respect to the claim of breach of the implied warranty of fitness for a particular purpose and denied with respect to the claim of breach of the implied warranty of merchantability.[19]

Count VII: Fraud by Concealment

In Count VII, Plaintiffs allege a claim for fraud by concealment. Wal-Mart moves to dismiss this claim on the ground that Plaintiffs fail to demonstrate that Wal-Mart concealed any fact, particularly given their admission that they did not rely on any advertisement from Wal-Mart when the bought the product and did not speak to anyone at the store. Plaintiffs respond that Wal-Mart had knowledge of the dangers of suffocation from crib bumper pads and concealed this knowledge from consumers.

"It is well-settled in Virginia that two elements are essential to a fraud claim: (i) a knowing misrepresentation or concealment of material fact, and (ii) reasonable and detrimental reliance on that misrepresentation or concealment." Torkie-Tork v. Wyeth, 739 F. Supp. 2d 895, 901 (E.D. Va. 2010) (citations omitted).

Under Virginia law:

A plaintiff asserting a cause of action for actual fraud bears the burden of proving by clear and convincing evidence the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4)

_____

[19] By the same reasoning, the motion for summary judgment by Garan as to the claim of breach of implied warranties (Count XV) is granted with respect to the claim of breach of the implied warranty of fitness for a particular purpose and denied with respect to the claim of breach of the implied warranty of merchantability.

with intent to mislead, (5) reliance by the party misled, and (6) resulting damage
to the party misled."

Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 507 S.E.2d 344, 346 (Va. 1998) (quoting

Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994)).

Plaintiffs have pointed to evidence that: 1) Wal-Mart was aware of the suffocation risks

associated with traditional crib bumper pads but did not share that information with consumers;

2) Wal-Mart advertised a mesh crib bumper as "safer" because it "reduces the risk of

suffocation"; 3) Wal-Mart separated the crib bumper pads from bedding sets in case they were

banned. However, it is undisputed that they did not rely on any statements made by Wal-Mart

when buying the product. (T. Micjan Dep. 64-65, 69-70; S. Micjan Dep. 40-41, 52.) Plaintiffs

argue that:

> the fact that plaintiffs did not purchase the crib bumper pad set "based upon any ...
> advertisement of the product" does not preclude their fraud claim. The obvious
> intended and anticipated use of a crib bumper pad is to be put inside a crib,
> supposedly to keep the baby safe(r), and it is certainly how the subject product is
> represented to consumers. Even defendants would not dispute that supposition.
> Plaintiffs purchased the crib bumper pad set because they thought it would make
> the crib safer, and nobody told them anything to the contrary; "[o]therwise, I
> would not have put it in there." See App. Exhibit A, pgs. 41-42, 47.

(ECF No. 130 at 13.)

However, the full context of this statement was as follows:

Q. You had testified that family members told you that the bumper pads were
safe, made the crib safer when you had Tyler [her older son]?

A. Yes.

Q. Did anyone tell you the opposite? Did anyone ever tell you that crib bumper
pads were unsafe?

A. No. Otherwise, I would not have put it in there.

Q. And I'm talking about family members. No family members ever told you
that?

A. No.

Q. What about any kind of doctor or nurse? Did anybody ever tell you that using those were unsafe?

A. No, I don't [sic].

(S. Micjan Dep. 47:5-17.)

Thus, as Wal-Mart points out, Stefanie Micjan was being asked if any family members had told her that the crib bumper pads were safe. She never stated that anyone on behalf of Wal-Mart made any representations about the crib bumper pads being safe. The only "act" on the part of Wal-Mart upon which Plaintiffs can be said to have relied is the act of placing the crib bumper pad on its store shelves. As noted above, there is no authority that would support construing a retail store's act of placing an item on its shelves as a "false representation." Therefore, with respect to Count VII, the motion for summary judgment will be granted.

Count VIII: Negligent Misrepresentation

In Count VIII, Plaintiffs allege a claim of negligent misrepresentation. Wal-Mart argues that Virginia law does not recognize this tort and Plaintiffs cannot maintain a claim for constructive fraud either. Plaintiffs argue that there is sufficient evidence of constructive fraud.

Virginia law does not recognize a separate tort of negligent misrepresentation, but considers it to be the essence of constructive fraud. Constructive fraud requires proof, also by clear and convincing evidence, "that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of ... reliance upon the misrepresentation." Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 507 S.E.2d 344, 347 (Va. 1998) (quoting Mortarino v. Consultant Eng'g Serv., 467 S.E.2d 778, 782 (Va. 1996)).

Plaintiffs contend that, by placing the crib bumper pad on its store shelves, Wal-Mart

falsely represented to customers, including them, that the product was safe for use in cribs (even though it was aware of suffocation hazards), and it never informed customers of any potential suffocation risks. They argue that they relied on the fact that the crib bumper pad was marketed as safe for its intended use and that they were injured by relying on this fact when they used the bumper pad in Dylan's crib and he asphyxiated on it. However, their only argument in response to Wal-Mart's observation that they admit to not having relied on any representations made by Wal-Mart in purchasing the product is to cite Stefanie Micjan's statement that, had she not been told that the product was safe, she would not have put it in the crib. (S. Micjan Dep. 47.)

As explained above, Stefanie Micjan's testimony related to what she was told by family members, not Wal-Mart. Plaintiffs have failed to point to evidence of reliance to maintain a claim for constructive fraud, and therefore with respect to Count VIII, the motion for summary judgment will be granted.[20]

Count XIX: VCPA Claim

In Count XIX, Plaintiffs allege a claim under the VCPA. Wal-Mart argues that Plaintiffs have not presented evidence of fraud and a knowing, deliberate decision not to disclose a material fact. Plaintiffs respond by citing to their argument relating to the fraud claim.

The VCPA prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction." Branin v. TMC Enterprises, LLC, 832 F. Supp. 2d 646, 650 (W.D. Va. 2011) (quoting Va. Code Ann. § 59.1-200)).

The VCPA defines a "consumer transaction" as the "advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family

---

[20] By the same reasoning, the motion for summary judgment by Garan as to the claim of negligent misrepresentation (Count XVII) is granted. Although Garan's prior motion for summary judgment as to this claim was denied, that motion raised different grounds.

or household purposes." Va. Code Ann. §59.1-198. A "supplier" is defined as a "seller, lessor or licensor who advertises, solicits or engages in consumer transaction, or a manufacturer, distributor or licensor who advertises and sells, leases or licenses goods or services to be resold, leased or sublicensed by other persons in consumer transactions." Id.

In Lambert v. Downtown Garage, Inc., 553 S.E.2d 714 (Va. 2001), the court held that a misrepresentation of fact was a necessary element of proof to the plaintiffs claim for fraud and a violation of the VCPA. Id. at 716. In Lambert, the plaintiff argued that the defendant's failure to disclose a material fact, i.e., the nature and full extent of the damages, constituted a misrepresentation in violation of the VCPA. However, the court held that, while the nondisclosure of a material fact, or misrepresentation by silence, may be the equivalent of a false representation, a violation of the VCPA "founded upon the nondisclosure of a material fact also requires evidence of a knowing and deliberate decision not to disclose the fact." Id. at 718. To maintain a VCPA claim based upon a fraudulent misrepresentation of fact, such an allegation "must contain the elements of fraud." See Jefferson v. Briner, Inc., 2006 WL 1720692, at *9 (E.D. Va. June 21, 2006) (citing Weiss v. Cassidy Dev. Corp., 63 Va. Cir. 76 (2003)).

As noted above with respect to Counts VII and VIII, Plaintiffs have not pointed to evidence to support a fraud claim against Wal-Mart, specifically the element of reliance. Therefore, with respect to Count XIX, the motion for summary judgment will also be granted.

Count XX: Wrongful Death

In Count XX, Plaintiffs allege a claim for wrongful death. Wal-Mart argues that their contributory negligence bars this claim. Plaintiffs respond that the alleged acts of negligence cited by Wal-Mart do not constitute alternative proximate causes of Dylan's death but are instead attempts to smear them as bad parents. Wal-Mart replies that there can be more than one

proximate cause of an injury.

Contributory Negligence

The Virginia Supreme Court has explained that:

> Contributory negligence is an affirmative defense that must be proved according to an objective standard whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances. <u>Sawyer v. Comerci</u>, 264 Va. 68, 74, 563 S.E.2d 748, 752 (2002); <u>Ponirakis v. Choi</u>, 262 Va. 119, 124, 546 S.E.2d 707, 710 (2001); <u>Artrip v. E.E. Berry Equip. Co.</u>, 240 Va. 354, 358, 397 S.E.2d 821, 823-24 (1990). The essential concept of contributory negligence is carelessness. <u>Sawyer</u>, 264 Va. at 74, 563 S.E.2d at 752; <u>Ponirakis</u>, 262 Va. at 124, 546 S.E.2d at 711; <u>Artrip</u>, 240 Va. at 358, 397 S.E.2d at 823-24.

> The issue whether a plaintiff is guilty of contributory negligence is ordinarily a question of fact to be decided by the fact finder. <u>Sawyer</u>, 264 Va. at 74, 563 S.E.2d at 752; <u>Hot Shot Express, Inc. v. Brooks</u>, 264 Va. 126, 135, 563 S.E.2d 764, 769 (2002); <u>Ponirakis</u>, 262 Va. at 125, 546 S.E.2d at 711. The issue becomes one of law for the circuit court to decide only when reasonable minds could not differ about what conclusion could be drawn from the evidence. <u>Hot Shot Express</u>, 264 Va. at 135, 563 S.E.2d at 769; <u>Love v. Schmidt</u>, 239 Va. 357, 360, 389 S.E.2d 707, 709 (1990).

<u>Jenkins v. Pyles</u>, 611 S.E.2d 404, 407 (Va. 2005). In <u>Jenkins</u>, the court held that the trial court erred in setting aside a jury verdict because of the plaintiff's contributory negligence in a motor vehicle accident when the evidence was in conflict regarding his ability to see the defendant's vehicle in the oncoming lane. See also <u>Fultz v. Delhaize America, Inc.</u>, 677 S.E.2d 272 (Va. 2009) (trial court erred in granting summary judgment for defendant on grounds of contributory negligence: reasonable minds could differ as to whether the plaintiff, who turned when her grandson moved suddenly as she stood at an ATM and tripped over metal bars protruding from the floor on each side, acted reasonably under the circumstances and the issue should have been presented to the jury).

> When a defendant relies upon contributory negligence as a defense, he has the burden of proving by the greater weight of the evidence not only that the plaintiff was negligent, <u>Burks v. Webb, Administratrix</u>, 199 Va. 296, 307, 99 S.E.2d 629, 638 (1957), but also "that his negligence was a proximate cause, a direct, efficient

> contributing cause of the accident," <u>Whitfield v. Dunn</u>, 202 Va. 472, 477, 117
> S.E.2d 710, 714 (1961); <u>accord</u> <u>Powell v. Virginian Railway Co.</u>, 187 Va. 384,
> 390-91, 46 S.E.2d 429, 432 (1948).

<u>Karim v. Grover</u>, 369 S.E.2d 185, 186 (Va. 1988).  Thus, even if the plaintiff in <u>Karim</u> had been

statutorily negligent in failing to have a lamp on his bicycle, reasonable minds could differ on

whether the violation of a statute was a proximate cause of his injuries when the evidence

indicated that the plaintiff was or should have been visible to the defendant driver, who

nevertheless turned into his lane of travel and struck him.  <u>See also</u> <u>Estate of Moses ex rel. Moses</u>

<u>v. Southwestern Va. Transit Mgmt. Co.</u>, 643 S.E.2d 156 (Va. 2007) (pedestrian who crossed a

street outside of a crosswalk testified that he looked both ways and no vehicles were coming, but

that a bus suddenly turned out of a bus station and struck him, thus reasonable minds could differ

as to whether his statutory violation was a proximate cause of his injury).  In this case, there is

not even an argument that Plaintiffs violated a statute or regulation.

"The proximate cause of an event is that act or omission which, in natural and continuous

sequence, unbroken by an efficient intervening cause, produces the event, and without which that

event would not have occurred." <u>Beverly Enterprises–Virginia v. Nichols</u>, 441 S.E.2d 1, 4 (Va.

1994).  Wal-Mart has not argued how most of the alleged acts on the part of the Plaintiffs

(leaving Dylan in his crib for an extended period of time, having a broken baby monitor, having

liquor bottles, cigarettes and drug paraphernalia in the house, owning a used, drop-side crib that

had been banned by the CPSC in 2011 and keeping one side down despite an express warning on

the crib)[21] "produced" the event of Dylan's death by asphyxiation.  See Spitz Dep. 55-57

(making an analogy that leaving a knife in a crib would certainly be "unconscionable" but if the

infant was not harmed by a knife, it could not be classified as a cause of death).

---

[21] Sala/Prange Rpt. (ECF No. 126 Ex. L) at 6-7, 23, 30; T. Micjan Dep. 192.

The only evidence of an alternative proximate cause to which Wal-Mart points is the presence of "soft bedding" items in Dylan's crib because he could have suffocated on these items and they are described as creating an unsafe sleeping situation. (Gunter Dep. 89-91.) Plaintiffs contend that there is no evidence that any of these items were near Dylan's face. (Thach Rpt. at 5; Gunther Dep. 90.) As to this issue, there are disputed issues of fact. See Sala/Prange Rpt. at 16 (noting that the location of the other soft bedding items was not specified by Travis Micjan and challenging his memory of an event that occurred under stressful circumstances).

Wal-Mart argues that there may be more than one proximate cause of an event. Williams v. Le, 662 S.E.2d 73, 77 (Va. 2008). The court continued by noting that:

> A subsequent proximate cause may or may not relieve a defendant of liability for his negligence. In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury.

Id. (citations omitted). However, Wal-Mart has not identified a subsequent proximate cause in this case, that is, assuming that Dylan suffocated when his face became wedged into the crib bumper pad, it has not pointed to some act by Plaintiffs subsequent to this event which superseded the operation of the negligence and caused his death. Although Wal-Mart contends that Plaintiffs were negligent for failing to check on Dylan for an extend period of time, it does not dispute that the suffocation took only 3-5 minutes (Spitz Dep. 260-61) and thus, unless they had checked on him during this time, they could not have prevented his death. The Court cannot hold as a matter of law that Plaintiffs' failure to check on Dylan within minutes of when he asphyxiated (whenever that occurred) constituted a subsequent intervening cause.

In addition, an "intervening cause does not operate to exempt a defendant from liability if that cause is put into operation by the defendant's wrongful act or omission." Williams, 662

S.E.2d at 77 (citation omitted). Thus, in that case, Dr. Le, the radiologist who discovered the blood clot but failed to make direct contact with the plaintiff's physician (Dr. McClain), could not argue that Dr. McClain's subsequent negligence in failing to check the diagnostic report which identified the blood clot that killed the plaintiff completely broke the chain the events between Dr. Le's negligence and the patient's death. Similarly, Wal-Mart cannot argue that Plaintiffs' failure to check on Dylan after he had suffocated on the crib bumper pad was an intervening cause that completely broke the chain of events leading to his death.

Therefore, the wrongful death claim may be maintained and, with respect to Count XX, the motion for summary judgment will be denied.[22]

Lost Earnings

Plaintiffs have requested damages for Dylan's lost earnings under both survival and wrongful death theories of recovery. Wal-Mart argues that Plaintiffs' estimates of his future earnings are based on pure speculation and do not meet the "reasonable certainty" standard required under Virginia law. Plaintiffs respond that their expert did not merely rely on statistics but utilized personalized factors and met the standard to support these damages.

The Virginia Supreme Court has stated that:

> The burden is upon a plaintiff to prove the elements of damages with "reasonable certainty." Gwaltney v. Reed, 196 Va. 505, 507, 84 S.E.2d 501, 502 (1954). Although "mathematical precision" is not required, the plaintiff must "furnish evidence of sufficient facts or circumstances to permit at least an intelligent and probable estimate" of damages. Id. at 507-08, 84 S.E.2d at 502. Estimates of damages based entirely upon statistics and assumptions are too remote and speculative to meet that test. In order to form a reliable basis for a calculation of lost future income or loss of earning capacity, such evidence must be grounded upon facts specific to the individual whose loss is being calculated. See Cassady v. Martin, 220 Va. 1093, 1100, 266 S.E.2d 104, 108 (1980).

---

[22] By the same reasoning, the motion for summary judgment by Garan as to the claim of wrongful death (Count XXI) is denied.

In a personal injury action, a plaintiff is not precluded from recovering damages for lost future earnings or for diminution of earning capacity by reason of his infancy. See Moses v. Akers, 203 Va. 130, 132, 122 S.E.2d 864, 865-66 (1961); Watson v. Daniel, 165 Va. 564, 573, 183 S.E. 183, 187 (1936). But we have never held that statistical averages alone can form a sufficient evidentiary foundation for such damages. In order to carry his burden of proof, an infant plaintiff, like any other plaintiff, must "furnish evidence of sufficient facts or circumstances" to enable the jury to make "an intelligent and probable estimate" of damages, Gwaltney, 196 Va. at 507-08, 84 S.E.2d at 502. Such evidence must relate to facts and circumstances personal to the plaintiff as an individual, not merely to his membership in a statistical class.

Bulala v. Boyd, 389 S.E.2d 670, 677-78 (Va. 1990). In that case, an economist predicted an infant's lost earning capacity simply by multiplying the median income for women in metropolitan areas in Virginia by the national average work life expectancy and the court held that this method was purely statistical and too remote to "permit an intelligent and probable estimate" of the infant's lost earning capacity. See also Chretien v. General Motors Corp., 959 F.2d 231 (4th Cir. 1992) (15-year old plaintiff sought to recover lost earnings based exclusively on an actuarial report and a general indication that she was "a good, college-bound student with aspirations of becoming an accountant," but court struck this claim as too speculative).

By contrast, in Musick v. Dorel Juvenile Group, Inc., 818 F. Supp. 2d 960 (W.D. Va. 2011), a case involving a five-year old who suffered traumatic brain injuries in a car accident, the court distinguished these cases. The plaintiff proffered reports of a vocational rehabilitation expert (Melberg) and economist (Cobb), who evaluated her characteristics and family background to determine the level of education she likely would have obtained absent her injury by interviewing the plaintiff and her parents, reviewing the academic reports and medical records, interviewing two of her treating physicians and studying the family academic history to conclude that she would have had the capacity to complete high school or an associate degree. The court held that:

The present evidence can be distinguished from that in the prior case law. Melberg and Dr. Cobb base their conclusions on a materially different type of information than the evidence at issue in Bulala and Chretien. Instead of only using statistical averages to calculate lost earning capacity, the plaintiff's experts combine facts personal to the plaintiff with national data that corresponds to the individualized evidence. Melberg considers the plaintiff's academic reports and medical records; a neuropsychologist's evaluation of the plaintiff; the Musick family's educational and vocational background; and his own diagnostic interview with the plaintiff and her parents. Dr. Cobb then takes this individualized data and uses it to calculate the plaintiff's future earnings. Thus, Melberg and Dr. Cobb's evaluation complies with the Supreme Court of Virginia's call for a more individualized analysis of lost earning capacity.

It is true that, even with their individualized technique, Melberg and Dr. Cobb cannot know with certainty the plaintiff's exact vocational path if not for her accident. However, quantification of damages is frequently not an exact undertaking. Precise calculations of actual lost earnings are impossible, especially when the plaintiff is an infant. Melberg and Dr. Cobb reach beyond generalized statistics and base their conclusions on information personal to the plaintiff. The fact that the plaintiff's ascertainable characteristics are limited by her youth is unavoidable and should not prevent her from presenting evidence to a jury of lost earning capacity.

Id. at 963-64.

In this case, Plaintiffs argued that their forensic economics expert, Donal F. Kirwan, did not merely rely upon statistical evidence to support his findings. Rather, he: gathered information from Travis and Stefanie Micjan to determine their educational levels, examined where they lived, noted the mother's age at the first birth, number of siblings, whether both parents were present in the family at the time of death, and cited the fact that Travis' brother, sister and uncles all have bachelor's degrees, which indicates that the parents would desire their child to go to college. (Kirwan Dep. 20-22, 24-25, 29-30, 35[23]; ECF No. 126 Ex. J.) Plaintiffs note that Wal-Mart points to other factors that Kirwan did not consider: parents' health, decedent's health, parents' employment history, parents' socioeconomic status, parents' spending habits, parents' academic records. (Kirwan Dep. 15, 18-19, 31, 64, 84.) They respond

---

[23] ECF No. 126 Ex. K.

that Kirwan indicated that these factors would not have been relevant to his analysis. (Kirwan Dep. 108-09.) Plaintiffs have demonstrated that the report in this case is more similar to the report in <u>Musick</u> than the report in <u>Bulala</u>.

Wal-Mart also argues that Plaintiffs may not recover for Dylan's impaired earning capacity because those damages are available only in a survival action. However, the Court need not resolve this issue because the survival actions should not be dismissed for the reasons cited above. Therefore, Wal-Mart's argument to limit Plaintiffs' damages relating to Dylan's lost earnings is rejected.

<u>Punitive Damages</u>

Plaintiffs have included punitive damages among their requests for relief. Wal-Mart argues that they have not submitted evidence that would support an award of punitive damages. Under Virginia law, punitive damages are recoverable "only where there is misconduct or malice, or such recklessness or negligence as evinces a conscious disregard of the right of others." <u>Boone v. Brown</u>, 2013 WL 5416873, at *2 (W.D. Va. Sept. 26, 2013) (quoting <u>Booth v. Robertson</u>, 347 S.E.2d 1, 2 (Va. 1988)). A plaintiff must show that the defendant was "conscious of his conduct, and conscious . . . that injury would likely or probably result from his conduct," and that the defendant "with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result." <u>Id.</u>

Wal-Mart argues that Plaintiffs present no evidence of any willful, wanton or malicious conduct on its part. Plaintiffs respond that they have pointed to evidence that Wal-Mart became aware of the dangers of suffocation presented by the crib bumper pad, but chose to do nothing; that it marketed the mesh liner as reducing the risk of suffocation; that it ignored its stated policy

of informing consumers about risks; and that it tested the product, but not for breathability or suffocation risks. Wal-Mart replies that the CPSC's 2013 study found "no conclusive or persuasive evidence implicating crib bumper pads as the primary cause of death, when the bumpers were used properly in an appropriate sleep setting." (ECF No. 136 Ex. L at 7.)

Wal-Mart has not cited authority indicating that punitive damages are unavailable in the kind of situation presented by Plaintiffs.[24] Neither have Plaintiffs cited authority indicating that such damages are available. Under the circumstances, it is premature to conclude that punitive damages will be unavailable in this case. Therefore, in this respect the motion for summary judgment will be denied.

In summary, for the reasons explained above, Wal-Mart's motion for summary judgment will be granted with respect to Counts V (breach of express warranties), VII (fraud by concealment), VIII (negligent misrepresentation) and XIX (VCPA) of the Complaint, granted in part and denied in part with respect to Count VI (breach of implied warranties), and denied with respect to Counts IV (negligence), XX (wrongful death), Plaintiffs' request for damages based on their deceased child's earning potential and Plaintiffs' request for punitive damages. As applied to Garan's joined motion, it is granted with respect to Count XVII (negligent misrepresentation), granted in part and denied in part with respect to Count XV (breach of implied warranties) and denied with respect to Counts XIII (negligence), XXI (wrongful death), Plaintiffs' request for damages based on their deceased child's earning potential and Plaintiffs' request for punitive damages.

Plaintiffs do not assert any claims directly against Triboro. Rather, its liability in this

---

[24] Wal-Mart also argues that a Virginia statute limits punitive damages to $350,000.00. Va. Code Ann. § 8.01-38.1. However, this section states that the jury should not be advised of this limitation, but rather the judge shall reduce the award it if exceeds this amount.

case depends upon the liability of Garan. Therefore, despite the fact that Triboro has joined in Wal-Mart's motion, it cannot be dismissed from this case unless all of Plaintiffs' claims asserted against Garan are dismissed and, for the reasons expressed above, that is not the situation presented. In addition, it is noted that Triboro's factual circumstances are not identical to those of Wal-Mart: for example, Triboro placed warnings on the product but Wal-Mart did not. Therefore, Triboro's joined motion for summary judgment is denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRAVIS MICJAN and STEPHANIE MICJAN,　)
Co-administrators of the Estate of DYLAN　)
MICJAN, a deceased minor and in their own right,　)
           Plaintiffs,　)
 　)
    vs　)          Civil Action No. 14-855
 　)
WAL-MART STORES, INC., GARAN, INC., and　)
GARAN SERVICES CORP.,　)
           Defendants,　)
 　)          Magistrate Judge Mitchell
    vs　)
 　)
TRIBORO QUILT MANUFACTURING CORP.,　)
          Third-Party Defendant.　)

ORDER

AND NOW, this 13th day of December, 2016,

IT IS HEREBY ORDERED that the motion for summary judgment filed by

Defendant Wal-Mart Stores, Inc. (ECF No. 123), and joined in by Defendants Garan Services

Corp. and Garan, Inc. (ECF No. 128) and by Third-Party Defendant Triboro Quilt Manufacturing

Corp. (ECF No. 127) is granted with respect to Counts V, VII, VIII, XVII and XIX, granted in

part and denied in part with respect to Counts VI and XV, and denied with respect to Counts IV,

XIII, XX, XXI, Plaintiffs' request for damages based on their deceased child's earning potential

and Plaintiffs' request for punitive damages.


                                s/Robert C. Mitchell
                                ROBERT C. MITCHELL
                                United States Magistrate Judge